## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

ENRIQUE MORAN-UBIETA,

    Plaintiff,

    v.

BAXTER HEALTH CARE DE PUERTO
RICO, INC., ET AL.,

    Defendants.

CIV. NO. 17-2193 (MDM)

## OPINION AND ORDER

Plaintiff Enrique Moran Ubieta ("Moran" or "plaintiff") brings this action against his former employer Baxter Healthcare S.A. ("Baxter") and Luis Vélez ("Vélez") (hereinafter collectively referred to as "defendants"). Plaintiff claims that defendants discriminated and retaliated against him because of his age in violation of the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. § 621 *et seq*. Plaintiff also invokes the Court's supplemental jurisdiction in this action to bring various claims under Puerto Rico law for alleged discrimination, unlawful retaliation, and wrongful discharge in violation of Puerto Rico Law No. 100 of June 30, 1958, as amended, 29 L.P.R.A. § 146 et seq. ("Law 100,") Puerto Rico Law No. 115 of December 20, 1991, P.R. Laws Ann. tit. 29, §§ 194 et seq. ("Law 115,") and Puerto Rico Law No. 80 of May 30, 1976, P.R. Laws Ann. tit. 29 §§ 185a–185m ("Law 80") and Articles 1802 and 1803 of the Puerto Rico Civil Code.

Presently before the Court is the defendants' motion for summary judgment in which they move to summarily dismiss all claims asserted by Moran in the complaint. (Docket No. 33). Plaintiff opposed the motion (Docket Nos. 40-41, 43) and the defendants then filed a reply thereto. (Docket No. 58). After careful consideration of the pleadings, and in light of the findings of fact and legal discussion set forth below, the Court **GRANTS in part** and **DENIES in part** the defendants' motion for summary judgment.

## I.   <u>Preliminary Matters: Affidavits</u>

Before moving onto the arguments which the parties believe dispositive, the Court must first resolve an objection raised by the plaintiff to several affidavits used by the defendants in their statement of uncontested material facts ("SUMF") in support of their motion for summary judgment. The defendants' motion draws support, in large part, from affidavits executed by various individuals who currently work, or have worked, for Baxter, namely, Edwin Betancourt, co-defendant Luis Vélez, and Todd Collis. The plaintiff challenges all three of those affidavits and moves to strike them, arguing that they are plagued by conclusory and hearsay evidence and because each contains facts that are not supported by the affiant's personal knowledge. The plaintiff also specifically objects to one of Edwin Betancourt's affidavits grounded on the "sham affidavit" doctrine.

As a threshold matter, on summary judgment, Rules 56(a) and (b) of the Federal Rules of Civil Procedure, provide that claimants and defendants may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a)-(b). A party asserting that a particular fact is undisputed must support that assertion "by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, *affidavits or declarations*, stipulations. . ., admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *Ortiz-Osorio v. Municipality of Loiza*, 128 F. Supp. 3d 442, 446 (D.P.R. 2015).

When, like here, the parties use affidavits or declarations as support, they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). *See also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"). Furthermore, under federal law, to support or oppose a motion for summary judgment, a party may offer an unsworn statement that is signed under penalty of perjury in compliance with 28 U.S.C. § 1746, in lieu of a sworn statement or affidavit. And, generally, evidence in the form of an affidavit is equal to other forms of evidence, such as deposition testimony. *See,* 10A Wright & Miller, Federal Practice & Procedure § 2727 (3d ed. 2011) ("facts asserted by the party opposing the

[summary judgment] motion, if supported by affidavits or other evidentiary materials, are regarded as true."). Even a clearly self-serving affidavit constitutes evidence which the court must consider when resolving summary judgment motions. *Malave-Torres v. Cusido*, 919 F. Supp. 2d 198, 204 (D.P.R. 2013); *See, Cadle Co. v. Hayes,* 116 F.3d 957, 961 n.5 (1st Cir. 1997) ("A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.").

The sham affidavit doctrine forbids a party opposing summary judgment from submitting an affidavit contradicting prior testimony solely to create an issue of fact. *Malavé-Torres*, 919 F. Supp. 2d at 203; *see also Escribano–Reyes v. Prof'l Hepa Certificate Corp.*, 817 F.3d 380, 387 (1st Cir. 2016). However, the doctrine does not bar a party from "elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition." *Id.*; *see also Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 26 (1st Cir. 2002). Further, the Court need not specifically enumerate each contradiction between a party's prior testimony and the later filed affidavit in order to disregard the evidence. *Orta–Castro v. Merck, Sharp & Dohme Química PR., Inc.*, 447 F.3d 105, 110 (1st Cir. 2006). The self-serving nature of the affidavit, alone, does not preclude the Court from considering an affidavit at summary judgment. *Perez-Maspons v. Stewart Title Puerto Rico, Inc.*, 208 F. Supp. 3d 401, 408 (D.P.R. 2016). *See, Malavé-Torres*, 919 F. Supp. 2d at 204 (compiling circuit precedents allowing self-serving affidavits as admissible evidence at summary judgment).

Here, the record contains two different statements given by Edwin Betancourt ("Betancourt") from two different dates. The plaintiff objects to Betancourt's latter statement, arguing that it is a self-serving "sham affidavit" prepared only to support the defendants' motion for summary judgment. He further maintains that the later filed affidavit includes facts that contradict his prior statement. By contrast, the defendants argue that Betancourt's second affidavit merely clarifies, rather than contradicts, his prior testimony. After a careful review of both affidavits, the Court agrees with the defendants.

Betancourt is a decisionmaker for Baxter as far as this Court is concerned. In his first affidavit, he attested to information concerning Baxter's decision-making process as it relates to the actions which the plaintiff challenges as unlawful in this suit. Betancourt's later-filed affidavit pertained mostly to that same information but with additional details—it elaborated on the intricacies and further expounded upon the specifics of the business decisions that Betancourt had testified about in his prior statement. Furthermore, the Court found no inconsistencies between the two statements nor any indication that the information in the second affidavit was included for some improper purpose. The Court thus finds that Betancourt's second affidavit merely explains and amplifies the information contained in his prior statement and, as such, the defendants are not barred from relying on it for summary judgment purposes.

On a final note, the sham affidavit doctrine is typically reserved for instances when a party *opposing* summary judgment submits an affidavit contradicting prior testimony solely to create an issue of fact to avoid the hot fire of summary judgment. *Malavé-Torres*, 919 F. Supp. 2d at 203. In this case, it is the moving party who submitted the challenged affidavit. Even if the doctrine could be used against a party moving for summary judgment, as it may well be, it is inapposite here.

The plaintiff also challenges the statements from Betancourt, co-defendant Luis Vélez ("Vélez"), and Todd Collis ("Collis"), claiming that each includes inadmissible hearsay because they are not based on personal knowledge. Plaintiff's contention does not hold water. To begin with, Betancourt, Vélez, and Collis all worked for Baxter during the relevant period, they all had decision-making authority, they all worked with Moran to some extent, and they were all involved in the employment decisions that Moran complains of in this action. As such, the information contained in each of their statements is clearly based on their personal knowledge of the events narrated therein since they were all active participants in the challenged decisions, or, at the very least, they were privy to relevant information.

Significantly, moreover, all the affidavits submitted by the defendants in support of their summary judgment motion, including the ones that Moran objects to, comply with the applicable legal requirements and are clearly based on the declarants' personal and specific knowledge of the facts asserted in the statements. Plaintiff has not offered

a meritorious or compelling legal reason to strike any of the challenged affidavits. So, to conclude with this preliminary matter, because the affidavits constitute valid evidence, they will be considered by the Court.

## II.   **Relevant Factual Background**

Taking all disputed facts in the light most sympathetic to the plaintiff, as the party opposing summary judgment, the Court makes the following factual findings, which are either undisputed or conclusively supported by the evidentiary record.[1]

Baxter operates three pharmaceutical plants in Puerto Rico, which are located in Aibonito, Jayuya and Guayama.

Plaintiff Moran was born on June 17, 1956. He began working for Baxter in 1982 as a Manufacturing Project Engineer in the Campo Rico plant in Carolina. Moran worked in the Carolina plant for approximately three years. He then worked in the Baxter plant in Jayuya as a Manufacturing Engineering Manager and later as a Plant Engineering Manager from 1985 to 1993. In 1993, Moran was transferred to the Carolina plant where he held the position of Engineering Services Manager. In 1999, Baxter closed the Carolina plant, which resulted in the termination of Moran's employment. Nevertheless, Moran continued to work for Baxter as an independent contractor until 2003.

In November 2003, when Moran was forty-seven (47) years old, Baxter rehired him as an Engineering Director for the Aibonito plant. Later, in January 2008, when Moran was fifty-one (51) years old, he was promoted to Plant Manager of the Aibonito plant. The Plant Manager was responsible for managing all the components inherent to the successful operation of the plant. As Plant Manager, Moran's duties included supervising the plant's manufacturing operations and providing the necessary resources to ensure that the plant's operation was successful. In addition, Moran was responsible for organizing, controlling, leading, and developing manufacturing strategies for the plant and supporting activities to maximize quality, efficiency, and profits. According to

---

[1] Pursuant to Local Rule 56, the Court will only deem as genuinely opposed those statements of material facts which the objecting party properly denied or qualified in strict compliance with Local Rule 56(c). The Court also credits only facts properly supported by accurate record citations. *See* Local Rule 56(e). Finally, the Court has disregarded all arguments, conclusory allegations, speculation, and improbable inferences disguised as facts. *See Forestier Fradera v. Municipality of Mayaguez*, 440 F.3d 17, 21 (1st Cir. 2006); *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

Moran, as part of his duties, he had to visit other plants in Puerto Rico and abroad to learn about their operations.

Initially, Moran's direct supervisor was Nelson Rodríguez, then Vice President of Manufacturing. In 2010, Moran began reporting to Manuel Domenech ("Domenech,") who became the Vice President of Manufacturing.

In 2014, management for the Aibonito plant implemented a new way to measure the plant's performance, namely, the "scorecard." The "scorecard" served to evaluate the performance of the plant and monitor its progress throughout the year. Basically, it is a document in a table format that includes specific metrics or goals that the Arecibo plant should meet each year. The "scorecard" served as a tool for management to make necessary adjustments to the plant's objectives. It was intended to keep track of things that might impact the plant's performance, to understand the areas with difficulties, where there was room for improvement, and what actions needed to be taken, if any. Moran and his supervisor, Domenech, discussed the results of the "scorecard" on a monthly basis, and, in turn, they updated the "scorecard" if necessary. The "scorecard" was divided into six (6) main categories: customer, financial, innovation, operational excellence, people and team, and quality and regulation. In 2014, the results of the "scorecard" reveal that the Aibonito plant did not meet several targets for that year.[2]

---

[2] Defendants submitted the 2014 "scorecard" (Exhibit 5 of their motion for summary judgment) for the proposition that the Aibonito plant failed overall to meet financial and operational expectations for 2014. (Docket No. 33-2). Baxter's theory is that the "scorecard" demonstrates that the Aibonito plant's performance for 2014 was poor and, as such, Moran failed to properly manage the plant and its resources. Admittedly, Moran stated that the plant did not meet several of the goals listed in the 2014 "scorecard," but he denies the defendants' basic proposition that the plant failed to meet *most* of the goals for 2014 and that the plant's performance for that year was poor. The problem with the defendants' contention is that the "scorecard's" content is not self-evident, and the defendants did not put the Court in a position to properly interpret its data. Therefore, the Court cannot reach many of the defendants' proposed factual stipulations related thereto.

While the defendants did provide some explanation regarding certain categories listed in the "scorecard," the reality is that Moran disputed most of the proposed factual stipulations, arguing that the "scorecard" did not support them. The Court conducted an independent review of the "scorecard," and after analyzing the defendants' SUMF related thereto, and the uncontested record, the Court must agree with Moran. Based solely on the "scorecard," the Court simply cannot conclude that the Aibonito plant's performance in 2014 was poor or substandard.

To begin with, the "scorecard" is mainly comprised of technical raw data, which the Court is not familiar with, but which it was asked to interpret in a vacuum. For example, the defendants did not provide the benchmarks for each category rated so there is no way for the Court to determine whether the "actual" score obtained for a given category was excellent, acceptable, poor, or somewhere in between. Without any context or benchmark on the scores obtained for each category, the Court

According to Edwin Betancourt (hereinafter "Betancourt"), then Vice President of Operations for Latin America at Baxter, the Aibonito plant's performance in 2014 was "deficient" and the plant failed to achieve the expected production goals. Moran also attested that the plant's performance in 2014 had room for improvement. In 2014, therefore, Moran's performance evaluation indicates that he only "partially met expectations." To that effect, Moran's performance evaluation states that:

> Aibonito had a poor performance across all elements. In addition, [the] plant received a Warning Letter mid-year that has led to a significant downward spiral of performance. While it is correct that [the] facility was ongoing [sic] a transfer, none of these activities were new in 2014, these are multi-year activities that started since 2011/12. Temporary organizational change[s] in manufacturing have yet to be completed to support operation . . . Service levels overall have been extremely poor and recovery plans [are] unpredictable. For a plant like Aibonito, 2014 was very disappointing.

According to Baxter, for those reasons, Moran's performance-based bonus for 2014 was significantly reduced. By contrast, according to Moran, the issues at the plant were not indicative of his performance *per se*, but rather caused by issues outside of his control.

---

cannot determine whether the performance was adequate or not. Interestingly, moreover, there are some categories where the actual result exceeded the target. Typically, exceeding a target is found to be excellent or above expectations. Here, however, pursuant to the defendants' arguments, the Court understands that exceeding the target in some categories might not necessarily be satisfactory. This leads to more confusion.

Furthermore, the "scorecard" does not include a score or rating for the *overall* performance of the plant. So, the overall performance score for the Arecibo plant does not appear in the document itself. In addition, the comments section is of no help to the Court because it contains only technical comments with foreign abbreviations that offer no clarity or assistance in understanding the contents of the document. Moreover, there is no explanation concerning the system of measurement used to rate the results for each category in the document—some categories are scored in terms of dollars, while others are scored in terms of percentages, numbers, and geometric figures. Also, with respect to the latter, the Court cannot know the meaning of the geometric figures in the "status" row because the "scorecard" does not include a legend to explain what the data stands for. Finally, the Court has no way of knowing what most of the sections, or many of the descriptions, stand for, because they are abbreviations which the defendants failed to explain, for example, "Dec HS", "VIP as a % or VOP," "EMS," "PE," "EHS." What those abbreviations mean, the Court does not know. That being the case, it is impossible for the Court to properly analyze the data of the "scorecard."

Based on the foregoing, by looking at the "scorecard" alone, the Court cannot conclude, as the defendants suggest, that the Aibonito plant's overall performance for 2014 was poor. Notwithstanding that, however, there is other evidence in the record which suggests that, in 2014, the Aibonito plant's performance was not up to par.

Pursuant to Moran's deposition testimony, in 2014, there were extrinsic situations occurring at the Aibonito plant, which significantly altered its performance, including the transfer of sets operations to the Dominican Republic and the layoff of 400 employees. In addition, the installation of a new solutions line caused part of the warehouse to be closed for construction. According to Moran, moreover, these factors directly affected the staging and storage process, increased the plant's expenses, and significantly affected the time and personnel dedicated to the process. Baxter acknowledged that the process of producing, packaging, and mailing products to the Dominican Republic required redistribution of the labor force and more expansive management duties for Moran. Notwithstanding that, however, according to Baxter, it was Moran's responsibility to manage, supervise, and oversee all these changes and endeavors. Baxter also claims that, as Plant Manager, Moran was ultimately responsible for ensuring that the plant's production was successful and any mismanagement or deficiencies that may have resulted from any project in 2014 was ultimately Moran's responsibility.

Moving on, between March 3, 2014, and May 12, 2014, the United States Food and Drug Administration ("FDA") conducted an inspection of the Aibonito plant.[3] Subsequently, on July 14, 2014, the Aibonito plant received a warning letter from the FDA. The FDA found various deficiencies and made some negative findings concerning the Aibonito plant. Particularly, the FDA found that the plant did not have a valid "test method and/or scientific evidence to show that its current visual inspection is capable of detecting particulate matter inside fluid path." The FDA also found that Baxter's device products were adulterated within the regulatory framework's meaning.[4] The FDA moreover found that the Arecibo plant's implementation of the procedures to investigate and respond to the "root cause" of that issue was inadequate, untimely, and deficient.

---

[3] The FDA is the agency responsible for regulating the manufacturing and quality standards of products for human consumption. The FDA periodically audits manufacturing plants and determines whether parts of the operations comply with the federal regulatory standards. A warning letter notifies a manufacturing company of specific issues and instructs them to make explicit improvements to comply with federal regulatory standards. If the identified improvements are not made to the manufacturing process, the company is warned that the operation could be detained.

[4] The warning letter further specified that Baxter had failed to properly implement the "CAPA" process already in place, which is the procedure for investigating deviations and establishing preventive corrective action. One of the issues found by the FDA had to do with "particulate detection" and Baxter has a company-wide protocol for "particulate detection," so it is not unique to the Aibonito plant that Moran managed.

In the warning letter, the FDA further specified that "the decision for not conducting field action was taken by Baxter's Corporate Medical Risk Assessment (MRA) and the Field Corrective Action (FCA) board." Per Moran's testimony, the person responsible for quality and regulatory compliance in Aibonito was the plant's Quality Director, and not him. Moran attested that, as the Plant Manager, it was his responsibility to take a leadership role in correcting the deficiencies identified by the FDA. Baxter also claims that it was Moran's responsibility, as the more senior executive at the facility, to take corrective measures to respond to the FDA's warning letter adequately and promptly and to fix the potential violations identified.

A month later, in August 2014, Baxter responded to the FDA warning letter, declaring that the company was engaged in a "division-wide action intended to bring enhanced prevention and control of particulate matter and leak [sic] across the lifecycle of the products." Baxter also affirmed that: "though Aibonito's Manufacturing processes currently include various design mitigations, prevention controls, and detection controls for particulate matter and leaks, we recognize there are opportunities for improvement, including to the visual inspection and CAPA processes." In the end, with Moran at the helm of the efforts, Baxter complied with the FDA's requirements and the warning letter issued to the Aibonito plant was "lifted," which means that the "issues" found were fixed or resolved.

Moran and his team were praised and congratulated by Baxter's top management for "lifting" the FDA warning letter. Betancourt characterized the task as a "major achievement" and said that Moran's performance, and that of his team, would "add high trust in the PR operations." Betancourt also stated in an email that the FDA expressed "comfort [in] how the plant addressed the issue" and that the achievement of closing the FDA warning letter "provided a lot of trust to our operation in PR. . . ." Other high-ranking managers at Baxter congratulated Moran and his team for their performance following the FDA warning letter.

One year later, in October 2015, Luis Vélez ("Vélez") began working for Baxter as Head of Operations, Caribbean Cluster. As Head of Operations, Vélez was responsible for supporting, supervising, and devising strategies to ensure that Baxter's plants in Puerto Rico achieved operational and production goals, amongst other duties. In line with

Vélez' affidavit, upon being hired by Baxter, he noticed that the plants in Puerto Rico were lacking "operational excellence" and "effective project management." Vélez also attested that he immediately began an initiative, which he termed "Enhance Baxter's Image," intended to give Baxter more public exposure and to make Baxter a more attractive place to work in terms of prestige, reputation, standing, and name-recognition. The initiative's ultimate goal was bringing new talent in two key areas: "operational excellence" and "project management." In line with that, in an email dated November 15, 2015, Vélez told his team, which included Moran, that one of the major goals for 2016 was to enhance Baxter's image as an "attractive company for new talent." Vélez also declared that he wanted to "bring new talented professionals to our organizations to ensure a brighter future to Baxter, especially in the Puerto Rico region."[5]

Two months after Vélez was hired by Baxter, on December 8, 2015, Moran received an email from Jean-Claude Bonte, congratulating him and his team for the job accomplished under Moran's leadership. In his email, Bonte praised the Aibonito plant in many operational areas and stated that out of all the plants he had visited in a recent United States tour, the Aibonito plant gave him the best impression. Bonte said that he was so positively impressed by the Aibonito plant that, having been a Plant Manager himself, he felt he had to share his sentiment with Moran, who was currently the Plant Manager at Aibonito.

For the 2015 performance evaluation, Moran obtained a "meets expectations" result, a presumably positive result.

In January 2016, Baxter hired a new Chairman and CEO.

Two months later, in March 2016, notwithstanding Moran's positive evaluation, he was removed from the Plant Manager position. Moran attested that after being informed of the decision to remove him as Plant Manager, Vélez told him that "with the changes going on at the company, he wanted to refresh the management of Aibonito" and, for that, Vélez "was going to hire a new General Manager." Moran also affirmed that he asked whether the decision to remove him from the Plant Manager position was related to his performance and he was told that it was not. Moreover, according to Moran, when

---

[5] *See* Docket No. 33-18.

he asked Betancourt specifically, Betancourt told him that his performance was *not* the reason for his removal as Plant Manager.

In line with Betancourt's declaration, the decision to make managerial changes in the Baxter plants in Puerto Rico was made back in October 2014, but it was not until March 2016 that he decided to implement the changes. Baxter's stated purpose for making managerial changes was to pursue new ideas with a fresh and innovative managerial approach.

As a result, in March 2016, Javier Ramis ("Ramis") was hired as the Plant Manager for the Aibonito plant. Ramis was 34 years old when he effectively replaced Moran, which was roughly the same amount of time that Moran had worked for Baxter. Ramis was an "outside" recruit, that is, he did not previously work for Baxter. Vélez and Betancourt both recommended Ramis for the position, but the ultimate decision to hire him was made and approved by Tim Lawrence, then Corporate Vice President Operations at Baxter International, Inc.[6] Solely based on their age, and the amount of time both had been in the workforce, Moran had more work experience than Ramis. Admittedly, Moran has no knowledge of the candidates that were interviewed for the Plant Manager position, nor does he have information regarding their ages.

Though Moran was removed from the Plant Manager position, he was not subsequently terminated from employment with Baxter. According to Moran, Vélez told him that he was working with Betancourt to create an engineering position for him "in the strategic region" where Moran could contribute his knowledge. As stated by Betancourt, when the decision to recruit Ramis as Plant Manager was made, Betancourt decided to create a Regional Engineering Director position and offer it to Moran. Betancourt created that position specifically for Moran. The purpose of creating such position was to service Latin American plants under corporate engineering supervision and to personally assist Betancourt with projects in the Latin American Region. The position was "unique," as it did not previously exist for the Latin American Region. Moran was told by Baxter management to speak to Vélez and Betancourt in order to "better understand what they expected from him" in terms of his duties.

---

[6] Though not pertinent to this action, a new Plant Manager was also hired for the Jayuya plant. Hector Cruz, who was forty-nine (49) years old, became the Jayuya Plant Manager.

In Betancourt's written statement, he said that he created the Regional Engineering Director position to avoid terminating Moran because he believed that Moran's proven technical engineering skills and extensive experience in the Baxter facilities would be best utilized in this position. According to Moran, however, Betancourt told him that the Regional Engineering Director position was created because of "the need of a vision from the point of view of engineering of facilities and of operations for strategic purposes of plant modifications and growth." At that time, Betancourt had been charged with consolidating three (3) Baxter plants in Mexico and Betancourt believed that Moran's technical skills and knowledge could be very useful in supporting the technical and logistical aspects of that project.

And so, in March 2016, Betancourt officially offered Moran the Regional Engineering Director position. For this new position, Moran was offered the same annual base salary and same benefits which he previously had as Plant Manager in Aibonito. Moran accepted the position. As Regional Engineering Director, Moran provided his technical engineering expertise by visiting plants in the Latin American Region and preparing assessments on the areas that needed improvement. In broad terms, Moran's duties included facilitating overall merging technologies and innovation strategies for the Latin American region, driving the implementation of leading practices and clear standards across the region, and managing projects in a cross functional basis in Puerto Rico. The position required Moran to travel frequently to foreign countries, which was not required as Plant Manager. For example, Moran traveled to Mexico to prepare an assessment of the plants located there. According to Moran, when he was offered the position, Vélez told him "get ready to travel." Moran also visited the Jayuya plant in Puerto Rico on several occasions and conducted an "assessment" of its deficiencies and made recommendations for improvement.

Several months later, in August 2016, Betancourt's position was eliminated as part of several significant global and regional operational changes implemented at Baxter. As a result, Vélez became the Head of Operations, Caribbean Cluster, and he was delegated some of Betancourt's duties. According to Vélez, as part of his new role, he analyzed the financial information of the Latin American operations and realized that the region was operating with a deficit and that several large cost items, like Moran's

salary, had not been properly budgeted. Vélez attested that, in September 2016, considering the corporate mandate to reduce costs, and given that the region was operating with a deficit, he concluded that he had to make several cuts to the region's expenses. Vélez further declared that one of the expenses he thought should be eliminated was Moran's salary. According to Vélez, Moran's new position as Regional Engineering Director was ascribed to the Global Facilities Engineering Division ("GFE") and, therefore, Vélez believed that the GFE should pay for Moran's salary, and not his division. Typically, the Regional Engineering Directors' compensation was funded by the GFE, but this was not true for Moran's particular position, which was never funded by the GFE, but rather was ascribed to the regional budget managed first by Betancourt, then later by Vélez.[7]

As stated by Vélez, he discussed with Todd Collis, then interim head of the GFE, the possibility of having the GFE fund Moran's position. It was decided, however, that the GFE would not fund the Regional Engineering Director position currently held by Moran. That being the case, Vélez determined that he would not fund Moran's position under his regional budget. In any event, Vélez attested that he did not believe there was a business necessity for the Regional Engineering Director position. As a result of Vélez' and Collis' decisions, since there would be no funding to pay for Moran's salary, it was determined that the Regional Engineering Director position recently created for Moran would be eliminated.

As a result, on August 26, 2016, Moran emailed Todd Collis to question him about the elimination of his "new" position. Moran stated in the email that it was "mindboggling" to him that after seeing the state of "disrepair" in Jayuya and having peeked into the Guayama plant, Baxter now believed there was no need for the position in the region. Moran also specified that "after 34 years working for Baxter [he] had never felt so misinformed about [his] future within the company since being replaced in [his] Plant Manager role in Aibonito and [later] offered this role in GFE earlier this year." Collis replied to Moran's email and said that no one at Baxter had asked or requested

---

[7] Baxter claims that Moran's compensation was allocated to, and paid out of, the Aibonito and Jayuya plant's payroll, which was included in the Caribbean Cluster's expenses currently under Velez' supervision.

him to reduce headcount in any way and that the only reason for eliminating his position was because Vélez "wanted to address his needs and finances." According to Collis, the basic question became "does the position exist if the funding doesn't." Moran believes that his position was properly funded. The financing of Moran's position, however, became an issue because Vélez wanted to address specific financial concerns under his jurisdiction and did not believe Moran's salary should be paid from his budget.

Consequently, the Regional Engineering Director position that had been recently created for Moran was eliminated effective October 2016. Moran held his "new" position for about five (5) months. As an incentive, Vélez offered to continue to pay Moran his existing salary of $200,395.64 for two (2) additional months to assist him with the transition to another position with a lower salary. According to Baxter, after the Regional Engineering Director position was eliminated, no one was hired to fill the position or to perform its duties.

Pursuant to Vélez' statement, to avoid terminating Moran, he offered him the Engineering Director position at the Jayuya plant because he believed that Moran could bring his technical engineering expertise there and because Moran had already prepared an assessment outlining the deficiencies of the Jayuya plant and a recommendation plan which he could now implement. When he was offered the Engineering Director position at Jayuya, Moran says that he was told that Vélez needed his expertise and leadership. Moran was offered a base salary of $175,000, which was lower than his prior compensation, in addition to health insurance and other benefits.

Vélez acknowledged that the distance to Jayuya was "difficult" and "far" for Moran who lived in the Metropolitan Area of Puerto Rico so, "traveling to Jayuya was not for [Moran] the best scenario." As for the duties of the position, Vélez attested that it was "highly expected that the leader be present most of the time at the location," i.e., the Jayuya plant. According to Vélez, however, considering that Jayuya was so far for Moran, Vélez decided to be flexible and allow Moran to have a flexible schedule, which included working remotely some days. Moran denies that Vélez ever told him of the "flexible work" option.

In September 2016, Moran was officially offered the Engineering Director position for the Jayuya plant. Baxter granted Moran until October 6, 2016 to consider the offer.

Moran had previously held the same Engineering Director position in Jayuya from 1988 until 1993.[8] Moran did not respond to Baxter's offer letter within the established timeframe and, therefore, on October 7, 2016, Baxter sent a letter to him reiterating the offer for the Engineering Director position at the Jayuya plant and granting Moran five (5) additional days to consider the offer. The letter indicated that if Baxter did not receive a response by October 14, 2016, "we will understand that you have rejected our offer and as a logical consequence, your employment with Baxter will end on the same date." According to Moran, Baxter informed him that if he did not accept the Engineering Director position in Jayuya, the only other option was to pay him a severance. As stated by Moran, this position was offered to him on a "take it or leave it" basis. Following his removal from the Plant Manager position in Aibonito, this offer would have constituted Moran's "second transfer" in roughly five (5) months.

On the same day of Baxter's second letter, October 7, 2016, Moran filed a charge with the Equal Employment Opportunity Commission ("EEOC,") alleging discrimination because of his age. Moran specifically claimed that he was removed from his prior position as Plant Manager of Arecibo and replaced by a younger individual. In the EEOC charge, Moran also claimed that after being replaced, he was transferred to the Regional Engineering Director position, which was subsequently eliminated in a matter of months. Upon the elimination of this "new" position, Moran claims that he was then being transferred to the Engineering Director position in the Jayuya plant with a substantial salary reduction. Essentially, Moran claimed that Baxter discriminated against him because of his age when he was replaced as Plant Manager and then "forced" him to resign from his employment by eliminating his position of Regional Engineering Director and then "forcing" him to accept the Engineering Director position, a lower-level, lower-paid, position in Jayuya, the most remote location in Puerto Rico. If Moran did not accept this "demotion," he claims that he would have been terminated from employment. The EEOC charge was the first and only charge, grievance, or complaint of discrimination that Moran filed against Baxter in any administrative or external forum.

---

[8] Moran also held an Engineering Director position from 2003 until 2008.

Later, on October 31, 2016, Moran sent an email to Miriam Bayron ("Bayron,") then Human Resources Director, Caribe & Quality, rejecting Baxter's offer to transfer him to the Engineering Director position in Jayuya. In that email, Moran specifically stated that his rejection of the position should under no circumstance be understood as a resignation of employment. On that same date, the Regional Engineering Director position held by Moran was officially eliminated and Moran's employment was terminated. According to Baxter, Moran's termination became effective on October 31, 2016, when he rejected the Engineering Director position in Jayuya. Baxter also maintains that his account was disabled that same day, pursuant to company practice. When Moran's employment was terminated, Baxter sent him a "Termination Agreement and Waiver of Claims," which specified that an alleged reorganization was "announced and implemented on October 31, 2016."

### III.   **Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see,* Fed. R. Civ. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006) (citation and internal quotation marks omitted).

The moving party bears the initial burden to demonstrate the lack of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325. To defeat summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences. *See, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. *Id*. If the court

finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. *Id.* at 248.

In cases like this one, which involve questions of motive or intent, the movant's burden is particularly rigorous. *Medina v. Adecco,* 561 F. Supp. 2d 162, 165–66 (D.P.R. 2008). Unsettled issues regarding motive and intent will often preclude summary judgment. *See, Lipsett v. Univ. of P.R.,* 864 F.2d 881, 895 (1st Cir. 1988). The court should deny summary judgment when the non-moving party "can point to specific facts detailed in affidavits and depositions—that is, names, dates, incidents, and supporting testimony—giving rise to an inference of discriminatory animus." *Lipsett,* 864 F.2d at 95. Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." *Forestier Fradera v. Mun. of Mayaguez,* 440 F.3d 17, 21 (1st Cir. 2006) (quoting *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir. 2003)).

## IV.   <u>Discussion</u>

In the complaint, Moran alleges that he was the subject of age discrimination and retaliation and that he was wrongfully terminated from his 34-year employment at Baxter. More specifically, Moran claims that defendants discriminated and retaliated against him because of his age: (1) when he was removed from the Plant Manger position in the Aibonito plant, replaced by a younger individual, and transferred to the Regional Engineering Director position; (2) when Baxter eliminated the Regional Engineering Director position roughly five months after it had been allegedly "created" for him; and, (3) when he was "forced" to either accept a demotion to Engineering Director in Jayuya or face employment termination.

The defendants deny Moran's claims and maintain that their decisions concerning Moran's employment were motivated by legitimate, non-discriminatory, business reasons unrelated to Moran's age. Defendants further claim that Moran has no evidence that would allow a factfinder to reasonably conclude that the challenged adverse employment actions were taken because of his age. In light of that, the defendants move for summary judgment on all claims asserted by Moran arguing that: (1) he cannot establish a *prima facie* case of age discrimination under the ADEA with respect to his transfer to the Regional Engineering Director position; (2) he cannot establish a *prima facie* case of age

discrimination under the ADEA as it relates to the elimination of the Regional Engineering Director position; and (3) he cannot establish a *prima facie* case of retaliation under the ADEA for any allegedly adverse employment action. The defendants also move for summary judgment on the plaintiff's claims under Puerto Rico law. The Court addresses each argument seriatim.

A.   Moran's age discrimination claim

The ADEA provides that it is unlawful for an employer to "refuse to hire or to discharge any individual or otherwise discriminate against [him] with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff asserting a claim under the ADEA has the burden of establishing "that age was the 'but-for' cause of the employer's adverse action." *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 138 (*citing Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)). In other words, when a plaintiff-employee claims that his employer violated the ADEA, he must "shoulder the ultimate 'burden of proving that his years were the determinative factor in his discharge [or adverse action alleged], that is, that he would not have been fired but for his age.'" *Torrech-Hernandez v. Gen. Elec. Co.*, 519 F.3d 41, 48 (1st Cir. 2008). *Dávila v. Corporación de Puerto Rico Para La Difusión Pública,* 498 F.3d 9, 12, 15 (1st Cir. 2007).

A plaintiff is not required to proffer direct evidence of discrimination and may meet his burden through circumstantial evidence. *Acevedo-Parrilla, supra.* To be sure, the First Circuit has acknowledged that "ADEA plaintiffs rarely possess 'smoking gun' evidence to prove their employers' discriminatory motivations." *Id.* (*quoting Arroyo–Audifred v. Verizon Wireless, Inc.,* 527 F.3d 215, 218-19 (1st Cir. 2008)). In the absence of direct evidence of age discrimination, courts evaluate ADEA claims under the three-stage burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, (1973). *See, Cameron v. Idearc Media Corp.,* 685 F.3d 44, 48 (1st Cir. 2012).

The first stage of the *McDonnell Douglas* burden-shifting framework requires a plaintiff to establish a *prima facie* case of employment discrimination. *Velázquez-Fernández v. NCE Foods*, Inc., 476 F.3d 6, 11 (1st Cir. 2007). In the context of an ADEA claim, this requires a plaintiff to show that: (1) he was at least forty years old at the time of the challenged action; (2) he was qualified for the position he held or his

work was sufficient to meet the employer's legitimate expectations, (3) he nevertheless suffered an adverse employment action; and (4) the employer subsequently filled the position with someone younger with roughly similar qualifications, thus revealing a continuing need for the plaintiff's services. *Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 447 (1st Cir. 2009); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–253 (1981); *Del Valle-Santana v. Servicios Legales De Puerto Rico, Inc.*, 804 F.3d 127, 129–30 (1st Cir. 2015) (also describing the fourth element as: "either younger persons were retained in the same position upon her termination[,] or the employer did not treat age neutrally in taking the adverse action.") The First Circuit has described meeting the initial *prima facie* showing as not onerous. *Caraballo-Caraballo v. Corr. Admin.,* 892 F.3d 53, 57 (1st Cir. 2018); *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003). To that effect, the *prima facie* case requires only a "small showing," one that is "easily made." *Id.* (*quoting Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 259 (1st Cir. 2001) and *Gillen v. Fallon Ambulance Serv. Inc.,* 283 F.3d 11, 30 (1st Cir. 2002)).

If the plaintiff establishes a *prima facie* case, it gives rise to an inference that the employer discriminated due to the plaintiff's age. *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 823 (1st Cir. 1991). The burden of production then shifts to the employer "to articulate a legitimate, non-discriminatory reason for its decisions." *Robinson v. Town of Marshfield*, 950 F.3d 21, 25 (1st Cir. 2020) *citing Vélez*, 585 F.3d at 447 (*quoting Arroyo-Audifred*, 527 F.3d at 219. If the employer articulates such a reason, then the plaintiff, to survive summary judgment, must provide evidence from which a reasonable juror could find that "the employer's proffered reason is actually a pretext for discrimination." *Mesnick*, 950 F.2d at 823. "[T]his question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that he was fired because of his age." *Id.* (citing *Ramírez Rodríguez v. Boehringer Ingelheim Pharm., Inc.,* 425 F.3d 67, 78 (1st Cir. 2005)).

Against that legal backdrop, the Court turns now to the facts of this case to determine whether Moran's allegedly adverse employment actions were motivated by his age.

### 1.    *Position transfer: Regional Engineering Director*

Defendants argue that they are entitled to summary judgment on Moran's age discrimination claim related to his transfer from Plant Manager to Regional Engineering Director. First, the defendants claim that Moran cannot make a *prima facie* showing of age discrimination because the transfer did not constitute an adverse employment action. Alternatively, they posit that even if Moran could make his *prima facie* showing, the transfer was motivated by legitimate business reasons unrelated to his age. Finally, the defendants maintain that should the Court reach the pretext question, summary judgment is nevertheless warranted because Moran lacks any evidence to show that the proffered legitimate, non-discriminatory reason for the transfer was a mere pretext for age discrimination. The Court begins with the first stage of the ADEAs' burden-shifting framework, Moran's *prima facie* showing.

### a.    The *prima facie* case

As for Moran's *prima facie* burden, it is undisputed that he was a person over forty years of age, who was qualified for the position at issue. As such, Moran neatly satisfies the first and second requirements of the *prima facie* case. Defendants' quarrel, however, is with the third element, because they claim that Moran's transfer to the Regional Engineering Director position did not constitute an adverse employment action. The Court disagrees.

Whether an employment action is materially 'adverse'—and therefore actionable under Title VII [and ADEA]—[is] gauged by an objective standard." *Blackie v. State of Me.,* 75 F.3d 716, 725 (1st Cir. 1996). "To determine if an employment action is in fact 'adverse,' courts look for whether it has 'materially change[d] the conditions of plaintiff['s] employ.'" *Natal Perez v. Oriental Bank & Tr.*, 291 F. Supp. 3d 215, 228 (D.P.R. 2018) (*citing Cherkaoui v. City of Quincy*, 877 F.3d 14, 25 (1st Cir. 2017)) (*quoting Gu v. Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir. 2002). "Material changes include 'demotions, *disadvantageous transfers* or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" *Gu*, 312 F.3d at 14 (*quoting Hernandez–Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998)) (emphasis added).

The First Circuit has recognized on several occasions that a transfer may constitute an adverse employment action. *See e.g., Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 23 (1st Cir. 2002); *Rodríguez-García v. Miranda-Marín*, 610 F.3d 756, 766 (1st Cir. 2010). However, not all transfers will suffice. A transfer is adverse if it materially changes the plaintiff's conditions of employment in a manner that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Burns*, 829 F.3d at 10 (quoting *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010).

The defendants argue that Moran's transfer from Plant Manager to Regional Engineering Director was not adverse because the transfer was "lateral," and it did not involve a decrease in benefits or pay. They point to First Circuit precedent finding that "[t]he clear trend of authority is to hold that a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Marrero*, 304 F.3d at 23 (*quoting Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997)). The defendants moreover maintain that while the transfer resulted in a change in the plaintiff's duties, the position required specialized technical engineering skills and was viewed as a prestigious and distinguished position in the company and, as such, it did not constitute a demotion.

Here, the uncontested record shows that after being removed from the Plant Manager position and transferred to Regional Engineering Director, Moran continued to earn the same salary and enjoy the same benefits that he previously enjoyed as Plant Manager. So, there was no change in terms of pay or benefits. That does not mean, however, that the transfer could not be found to be an adverse action. The First Circuit has squarely rejected the notion that "a transfer cannot qualify as an 'adverse employment action' unless it results in a diminution in salary or a loss of benefits." *Caraballo-Caraballo*, 892 F.3d at 61; *Marrero*, 304 F.3d at 24; *see also Rodríguez-García*, 610 F.3d at 766-67 (holding that plaintiff's transfer was an adverse employment action due to her change in duties, despite retaining the same salary and title). Instead, the fact that a transfer leaves an employee with "significantly different responsibilities," may make the transfer actionable. *Caraballo-Caraballo, supra.*

Moran's transfer meets that standard. The defendants admitted that the transfer resulted in a change in Moran's duties and responsibilities. Naturally, stepping down from Plant Manager to Regional Engineering Director meant the transfer involved a major decrease in rank and standing. Moran was no longer the highest ranking official in the Aibonito plant. According to Moran, he went from supervising around one thousand employees, including approximately two hundred administrative employees, to having no supervisory responsibilities. Before being transferred, Moran was responsible for the overall plant's direction and operation and was a key participant in strategic decisions. In the defendants' own words: "the buck stopped with him" as he was the general manager of the plant. After his transfer, however, Moran attested that he had no decisional authority. Clearly, Moran's new position involved more circumscribed and limited duties with no supervisory responsibilities. Additionally, though not dispositive, there is evidence that Moran went from having a nice corner office with views, and having an assistant, to having a small cubicle in an old building and no assistant. His new role also entailed frequent international traveling, whereas before he only traveled a few times to the United States.

Here, even though Moran retained the same salary and benefits, the transfer to Regional Engineering Director involved significantly different responsibilities and resulted in a decrease in rank and title. As a result, the transfer caused a discrete change in the terms and conditions of Moran's employment, which had some detrimental effect to his employment. *See, Cham v. Station Operators, Inc.*, 685 F.3d 87, 94 (1st Cir. 2012) citing *Morales Vallellanes*, 605 F.3d at 35.

On a final note, the factual scenario of this case further supports a finding that Moran's transfer constituted a materially adverse employment action because Moran was transferred from a secure position as Plant Manager to Regional Engineering Director, a position that was allegedly "created" for him, but which had no future because a few months after its inception it was eliminated by Baxter, leaving Moran effectively without a job. Under these unique circumstances and viewing the evidence in the light most favorable to the plaintiff, the Court finds that a reasonable juror could find that Moran's transfer had a significantly detrimental effect on his employment. To come to the point, the disparity in duties and the change in rank distinguishes Moran's transfer from those

the First Circuit has found insufficient and makes the transfer an adverse employment action. Moran therefore meets the third prong of the *prima facie* case.

The Court now turns to the fourth and final element of the *prima facie* showing— whether Moran was replaced by someone younger with roughly similar qualifications, thus, revealing a continued need for the same services and skills as the plaintiff provided. Moran easily meets this prong because the uncontested record shows that Ramis, who was thirty-four (34) years old, and much younger than Moran, was hired by Baxter in March 2016 as the Plant Manager, effectively replacing Moran in all his duties. The above facts are enough to meet what the First Circuit has regularly described as a "low standard" for the *prima facie* showing in a discrimination case. *Vélez,* 585 F.3d at 447 (quoting *Zapata–Matos v. Reckitt & Colman, Inc.,* 277 F.3d 40, 44 (1st Cir. 2002)). As for Moran's transfer to Regional Engineering Director, he has established a *prima facie* case of age discrimination.

b.   <u>Defendants' alleged legitimate business reason</u>

Having met his *prima facie* showing, Moran has triggered the "rebuttable presumption that [defendants] violated the ADEA," and they now have "the burden of production—as distinguished from the burden of proof—. . . to articulate a legitimate, nondiscriminatory basis" for the transfer. *González,* 304 F.3d at 68–69.[9]

Defendants maintain that the transfer was a lawful business decision, unrelated to Moran's age. Their theory is that around October 2014 Baxter's management decided to shift and refocus the operations of the Aibonito plant under new leadership and, as a result, they decided to replace Moran as Plant Manager and later decided to transfer him to Regional Engineering Director, a position which they claim was "created" for Moran to retain his technical engineering skills. The defendants maintain that their decision was guided by a business and operational need to shift leadership in hopes of improving the performance and production results of the plants in Puerto Rico. In support of their theory, defendants observe that the Aibonito plant, which Moran oversaw, "had a poor performance across all elements" and had opportunities for improvement. They also point

---

[9] The Court's role is not to second-guess the business decisions of an employer, nor to impose its subjective judgments of which person would best fulfill the responsibilities of a certain job. *See Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 31 (1st Cir. 1990); *Rossy v. Roche Products,* 880 F.2d 621, 625 (1st Cir. 1989).

to Moran's 2014 performance evaluation, where he only "partially met expectations." They further allude to the FDA warning letter dated July 14, 2014, which shows that the Aibonito plant was under scrutiny in 2014 for failing to correct a product contamination issue. Moreover, they rely on an affidavit prepared by Betancourt, then Vice President of Operations for Latin America at Baxter, wherein he explains the reasons for making leadership changes to the operations of the Aibonito plant.[10]

More specifically, Betancourt attested that he believed the best strategy to "salvage the plants and make them profitable once more" was to "hit the reset button and refocus manufacturing operations under new leadership." Betancourt further indicated that "given the FDA letter received by both the Jayuya and Aibonito plants, their deficient performance[,] and inadequate production results," he decided to recognize and accept the recommendations from corporate management to the effect that a shift in leadership was required. One of those changes included replacing Moran as Plant Manager of Aibonito (and replacing the Jayuya manager). According to Betancourt, when Moran was actually replaced, he decided to create the Regional Engineering Director position for him, where his technical and engineering abilities would better serve the company.[11]

The foregoing constitutes the defendants alleged nondiscriminatory reason for removing Moran as Plant Manager and subsequently transferring him to Regional Engineering Director. Here, the Court has no trouble finding that defendants put forward a legitimate, nondiscriminatory reason for those decisions. As a result, the defendants have rebutted the presumption created by Moran's *prima facie* case. The Court thus moves to the third and final phase of the burden-shifting framework where the burden

---

[10] *See* Defendants' Exhibit 6 to their motion for summary judgment and Docket No. 40-18.

[11] The Court cares to make a comment on the timeline surrounding the decision to remove Moran as Plant Manager and his eventual transfer. The defendants claim that the decision to remove Moran as Plant Manager was allegedly made back in October 2014, but it was not until March 2016 that the decision was actually implemented. Based on the defendants' arguments, the decision to remove Moran as Plant Manager was grounded on events that occurred in 2014. But the undisputed record shows that Moran was actually replaced as Plant Manager by Ramis in March 2016, years later. The record also shows that in March 2016, Betancourt decided to create the Regional Engineering Director position to assist him with projects in the Latin American Region. The position was offered to Moran then. There is, therefore, a significant gap between the time the decision to remove Moran as Plant Manager was allegedly made (October 2014) and the time Moran was replaced and transferred (March 2016).

of persuasion shifts back to Moran who must show that the defendants' proffered justification is a pretext for age discrimination.

c.    <u>Moran's claim of pretext and discriminatory intent</u>

The Court's focus turns now to "the ultimate issue," which is whether—after assessing all of the evidence on the record in the light most favorable to [Moran]—"[he] has raised a genuine issue of fact as to whether" his removal as Plant Manager and transfer were "motivated by age discrimination." *Acevedo-Parrilla,* 696 F.3d at 140 (*citing Domínguez–Cruz*, 202 F.3d at 431). To meet this burden, "[Moran] must offer some minimally sufficient evidence, direct or indirect, both of pretext and of [defendants'] discriminatory animus." *Mesnick*, 950 F.2d at 825. The plaintiff must "elucidate specific facts which would enable a jury to find that the reason given" by the defendant for the adverse employment action "is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." *Soto-Feliciano*, 779 F.3d at 25 (*quoting Mesnick*, 950 F.2d at 824).

According to the defendants, Moran has not proffered sufficient evidence to support his theory that he was replaced as Plant Manager and transferred to Regional Engineering Director because of his age. They first claim that Moran cannot dispute the facts that in 2014, the Arecibo plant's performance was deficient and that, under his direction, the plant received a warning letter from the FDA. Second, they contend that Moran has no evidence to challenge the fact that the management for the company believed in good faith that the best business decision was to change the plant's leadership. Third, though they acknowledge that Moran points to several allegedly ageist remarks made by Baxter management personnel, the defendants argue that such remarks were uttered by non-decisionmakers, were not discriminatory in nature and constitute isolated remarks. According to the defendants, the comments alluded to by Moran are insufficient to establish pretext. Fourth, they observe that Betancourt, who made the decision to replace Moran as Plant Manager, was sixty years old at the time of the decision and only two years younger than Moran. Finally, the defendants admit that Moran was replaced by a significantly younger individual but nevertheless argue that the mere fact that a younger person replaces an older person in a given position, standing alone, is insufficient to permit an inference that the transfer was motivated by age.

In response, Moran points to evidence intended to cast doubt on the defendants' stated reasons for replacing him as Plant Manager with a younger person and then transferring him to Regional Engineering Director. Moran claims that the defendants' proffered reasons for the challenged adverse action are pretextual because his age was the real reason behind them. The Court considers Moran's attestation of pretext, "having in mind that courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 54 (1st Cir. 2000) (citing *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 167 (1st Cir. 1998)). In keeping with this principle, the Court finds that Moran has met the "minimally sufficient" standard to proceed with this claim because he has proffered evidence sufficient to raise genuine issues of material fact on the pretext inquiry.

To begin with, Baxter claims that part of the decision to remove Moran as Plant Manager and transfer him to a lower ranking position had to do with his alleged subpar performance in 2014 and the FDA warning letter. By contrast, there is evidence in the record, that Moran was told by Betancourt—who Baxter claims was the decisionmaker— that Moran's performance was *not* the reason for removing him as Plant Manager. Moreover, while the defendants make much of Moran's allegedly poor performance in 2014 as one of the reasons for his removal and transfer, the record shows that in 2015, he obtained a good evaluation with a "meets expectations" result and received a large performance bonus. It is important to remember that Moran was replaced as Plant Manager and transferred in March 2016. Additionally, the defendants point to the receipt of the FDA warning letter to justify their decision, but it is uncontested that Moran was singularly congratulated and highly praised by Baxter executives for successfully lifting the FDA warning letter. Such a deed was characterized by Baxter management as a "major achievement" that gave a lot of trust to the company's operations in Puerto Rico. Despite the above, Moran was replaced as Plant Manager in March 2016, *following* a good performance evaluation, and *after* the FDA warning letter had been successfully

lifted by Moran and his team. This incongruency indeed casts a seed of doubt as to whether Baxter's articulated reason for Moran's removal and transfer is mere pretext.[12]

In addition, Moran offers further proof that could lead a reasonable juror to find that the defendants' explanation for Moran's transfer was simply implausible and thus a pretext for discrimination. Moran claims that two decision makers, Vélez and Betancourt, made discriminatory comments about Moran's age, which according to him, constitutes direct evidence of discriminatory animus. He also argues that the ageist comments were contemporaneously made with the decision to replace and transfer him. For instance, Moran attested during his deposition that when he was informed that he was going to be removed from the Plant Manager position, Vélez told him that "with the changes going on at the company, he wanted to *refresh* the management of Aibonito" and, for that, Vélez "was going to hire a new General Manager."[13] Pursuant to Moran's deposition testimony, Vélez also made the following ageist remarks: (1) in November 2015, Vélez said that one of his goals was to bring in "new people" so that the operations in Puerto Rico have a "more brilliant future;" (2) in meetings with company directors in 2015, Vélez said that he wanted to bring in "new talent" and to make Baxter "sexier;" (3) in a meeting held in December 2015 with Human Resources managers, Vélez said that he wanted to make Baxter "sexy;" (4) in a meeting with plant managers in January 2016, Vélez indicated that he wanted to make Baxter "sexy again" and "attractive for Mayaguez graduates as it had been when he graduated from Mayaguez;" (5) on November

---

[12] To explain the inconsistency, Baxter maintains that the decision to make managerial changes in the Puerto Rico plants and, therefore, remove Moran as Plant Manager was made back in October 2014 but that the decision was not executed until March 2016. In support thereof, the defendants point to a statement prepared by Betancourt on March 4, 2019, which is contemporaneous with the defendants' motion for summary judgment. (*See* defendants' Exhibit 6 of their motion for summary judgment). As noted in the beginning of this Opinion, the plaintiff challenges Betancourt's statement, claiming that it constitutes a sham affidavit because it is inconsistent with a prior statement made by Betancourt, prepared on November 4, 2016, where he stated that Baxter decided to make managerial changes at the Aibonito plant in March 2016. In his later statement, Betancourt says the decision was made back in October 2014 but executed in March 2016. Indeed, there is a discrepancy. As for plaintiff's sham affidavit argument, the Court previously found that such a challenge to Betancourt's later statement was unavailing. The factual discrepancy, however, and whether the defendants' explanation is indeed credible, will need to be resolved by the trier of fact.

[13] Moran offers this evidence through his own deposition testimony, which is proper "[p]rovided that the [his] deposition testimony sets forth specific facts, within his personal knowledge, that, if proven, would affect the outcome of the trial. . ." *See Velazquez*, 473 F.3d 11 at 18. As such, "[t]he testimony must be accepted as true for purposes of summary judgment." *Id.*

2015 or early 2016, while in Moran's office and referring to Moran's diploma of a technical award, Vélez said "Hail Mary, Moran, that appears to be a piece from a museum" (like an antique); and, (6) during that same visit to Moran's office, Vélez said, when referring to an "iron key" (pen drive that was a large hard disk), Vélez said that the size of the device was "obsolete" and to "make [him] a requisition and he would buy him a modern one." As for Vélez' comments to make Baxter "sexier" and "attractive for Mayaguez students," Moran attested that he was the only Engineer removed from the Aibonito plant as part of that initiative.[14]

Defendants dismiss the allegedly ageist comments as "stray remarks," arguing that they do not demonstrate discriminatory motivation. They maintain that none of the remarks refer to age or were in any way related to the decision to replace Moran as Plant Manager or transfer him.[15] By contrast, Moran argues that the comments were neither isolated remarks nor age-neutral because "refreshing" the company meant revitalizing and rejuvenating it, which, by definition, meant making it young again. Furthermore, Moran claims that the comments related to making Baxter "sexier" by hiring "new" people were clearly aligned with a vision intended to hire younger individuals than Moran. Finally, Moran avers that the comments were contemporaneous to the decision to transfer him and uttered by decisionmakers. And, as such, he claims they show discriminatory animus.

Here, the allegedly discriminatory comments were made by Vélez, a high ranking official, and one who was allegedly involved in the challenged adverse actions. *See Santiago–Ramos,* 217 F.3d at 55 (citing *Sweeney v. Bd. of Trustees of Keene State Coll.,* 604 F.2d 106, 113 (1st Cir. 1979)). "[S]uch evidence . . . does tend to add 'color' to

---

[14] Defendants categorically denied this statement by Moran, arguing it was a conclusory argument by counsel. It is not. Upon reviewing the record independently, the Court found that the objected statement is a direct quote from Moran's unsworn declaration. (Docket No. 40-30). The Court, who is not the trier of fact, cannot assess the credibility of the witnesses. So, the Court cannot weigh the credibility of this statement or any other statements made my Moran under oath during his deposition. Neither can the Court assess the credibility of the statements proffered by the defendants. But, at this stage, what the Court must do is resolve all evidentiary conflicts and draw all reasonable inferences in favor of Moran as the non-moving party. *See Sánchez–Rodríguez,* 673 F.3d at 9.

[15] The defendants offer evidence through Velez' declaration in an effort to show that the comments were unrelated to age and to explain the alleged meaning behind them. On summary judgment, however, the Court must resolve all evidentiary conflicts and draw all reasonable inferences in favor of Moran. *See Sánchez–Rodríguez,* 673 F.3d at 9.

the employer's decision[-]making processes and to the influences behind the actions taken with respect to the individual plaintiff." *Cummings v. Standard Register Co.,* 265 F.3d 56, 63 (1st Cir. 2001) (internal quotation marks omitted) (quoting *Conway v. Electro Switch Corp.,* 825 F.2d 593, 597 (1st Cir. 1987)). Moreover, while it is true that stray workplace remarks, *standing alone,* do not ordinarily support a showing of discriminatory animus (*see, González v. El Día, Inc.* 304 F.3d 63, 69 (1st Cir. 2002)), here, there is more. *See, Velázquez-Garcia,* 473 F.3d at 18; *McMillan v. Mass. Sec'y for Prevention of Cruelty to Animals,* 140 F.3d 288, 300-01 (1st Cir. 1998) ("stray remarks may properly constitute evidence of discriminatory intent for the jury to consider in combination with other evidence"); *Santiago–Ramos,* 217 F.3d at 55 (decisionmaker's comments and timing of firing are material facts for a jury to consider).

In the present case, Moran's evidence, taken together, could call into question the motive behind Baxter's decision to "refresh" the company's image and make it "sexier" under new leadership, which resulted in Moran being replaced by a substantially younger individual and subsequently transferred to a lower ranking position.

Furthermore, the Court previously found that there is a material factual dispute over *when* the decision to replace Moran as Plant Manager was taken, either October 2014 or March 2016. This incongruity is significant because, as noted, the defendants claim that the decision had been made in October 2014, when Vélez was not working for Baxter, as such, they claim that Vélez was not involved in the decision to remove Moran as Plant Manager. Indeed, Vélez began working for Baxter in October 2015 as Head of Operations, Caribbean, and, for that reason, the defendants claim that Vélez' comments are somewhat irrelevant because he was allegedly not involved in the employment decisions at issue. On this record, however, it is not at all clear whether or not Vélez participated in the decision to remove Moran as Plant Manager and later transfer him. And the issue boils down to a credibility determination, which the Court is barred from making. What is clear though is that Moran was ultimately replaced by a younger person and actually replaced and transferred in March 2016 during which time Vélez had been working for Baxter as a decision maker and had made the allegedly discriminatory comments. Certainly, whether Vélez was involved in the business decision related to

Moran's replacement and transfer is a question of material fact which must be resolved by a jury.

There are also undisputed facts that further support the Court's conclusion. For example, both Vélez and Betancourt supported the decision to hire Ramis to substitute Moran. Furthermore, Ramis was substantially younger than Moran when he effectively replaced Moran. Courts have routinely found that "[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination." *Williams v. Raytheon Co.,* 220 F.3d 16, 19 (1st Cir. 2000) (*quoting Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147 (2000)). "An explanation is unworthy of credence when it [sic] suffers from 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions. . .' such that a factfinder could 'infer that the employer did not act for the asserted non-discriminatory reasons.'" *Hubbard v. Tyco Integrated Cable Sys., Inc.*, 985 F.Supp.2d 207, 228–29 (D.N.H. 2013) (*citing Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000)).

Here, Moran has offered evidence sufficient to show potential inconsistencies in the record, when compared to the defendants' proposed non-discriminatory business reasons for Moran' removal and transfer. These inconsistencies are material and might lead a reasonable juror to disbelieve the defendants' articulated business reason for replacing Moran as Plant Manager and transferring him to Regional Engineering Director. On the whole, analyzing the totality of the circumstances in this case, and viewing the evidence in the light most favorable to Moran, the Court finds that the inconsistencies raised by Moran's aggregate package of proof could call into question the defendants' proffered legitimate reasons for the challenged adverse actions. To wrap it up, without much question, Moran has offered at least "minimally sufficient evidence" to raise a genuine issue of material fact on whether the reasons given by defendants for his removal as Plant Manager and subsequent transfer were merely a pretext for age discrimination.

The Court's analysis does not stop there. While the above evidence could support the conclusion that defendants' explanations for Moran's transfer were pretextual, this is not enough for Moran to defeat summary judgment; he must also show that the

pretextual reasons were "intended to cover up the employer's real motive: age discrimination." *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 143; *Id.* at 824. The Court finds that, overall, Moran's proof, taken together, is sufficient to raise questions of material fact on the ultimate issue: whether the true reason behind his transfer was age discrimination. Albeit a close call, Moran survives summary judgment on this claim because he elucidated evidence sufficient to enable a jury to reasonably infer that the employer did not act for the asserted legitimate, non-discriminatory reason. The Court concludes with Moran's first allegedly adverse action.

### 2. *Elimination of the Regional Engineering Director Position*

In the complaint, Moran also claims that he suffered discrimination on the basis of age when Baxter eliminated the position of Regional Engineering Director, shortly after he was replaced as Plant Manager. Defendants move for summary disposition of this claim, alleging that Moran fails to establish a *prima facie* case of age discrimination.

### a.   The *prima facie* case

Here, the defendants concede that Moran met the first element of the *prima facie* case because he was over forty (40) years of age at the time of the challenged action. For purposes of summary judgment, they also concede that Moran established the second and third elements, namely, that he met the company's legitimate expectations of the position and that he suffered an adverse employment action when the position was eliminated. Defendants nevertheless maintain that Moran cannot establish his *prima facie* burden because he cannot meet the fourth element, namely, that Baxter subsequently filled the position, demonstrating a continuing need for Moran's services. *See, Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000). Defendants contend that the Regional Engineering Director position was indeed eliminated, but Baxter has *not* hired *anyone* to fill the position and the duties of the position have *not* been carried out by any other employee. In support thereof, the defendants offer an unsworn statement under penalty of perjury by Elizabeth Centeno Lopez, Senior Human Resources Manager at the Aibonito plant. (*See,* Docket No. 33-3).

Moran does not challenge Centeno's declaration, nor does he deny the fact that the Regional Engineering Director position was in fact eliminated.[16] Moran nevertheless tries to cast doubt on the defendants' proffered legitimate business reason for the decision. Baxter claims that it was purely financial, made in efforts to comply with a global mandate to reduce costs, and that it was driven by budgetary issues concerning Moran's salary. On his part, Moran broadly claims that the transfer to Regional Engineering Director was "the first step of a plan by Baxter" to ultimately fire him in a scheme to discriminate against him due to his age. Moran's argument does not hold water for various reasons.

First, Moran fails to corroborate his conspiracy claim with actual proof. While Moran points to *one* piece of evidence—an email by Lydia Martinez, Finance Director— in an attempt to raise a factual issue on whether the Regional Engineering Director position was not properly budgeted—such a dispute is irrelevant. Second, Moran seems to be putting the cart before the horse by skipping over to questioning defendants' proffered legitimate business reason for eliminating the position but, to get there, Moran must have first made out a *prima facie* case under the ADEA. The bottom line here is that Moran fails to meet his *prima facie* burden and his claim therefore fails as a matter of course. The Court explains.

As noted, Moran meets the first three requirements of the *prima facie* case. To satisfy his *prima facie* burden Moran must prove, by a preponderance of the evidence, that "the employer did not treat age neutrally in taking the adverse action." *Del Valle– Santana*, 804 F.3d at 129–30 (citing *Brennan*, 150 F.3d at 26). A plaintiff can satisfy this element by showing "that [his] employer filled the position, thereby showing a continuing need for the services that he had been rendering," *Melendez*, 622 F.3d at 50, or that he was treated differently than similarly-situated, substantially-younger employees, *Del Valle–Santana*, 804 F.3d at 130–31; *see also O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996); *Costa Del Moral v. Servicios Legales de P.R.,* 63 F. Supp. 2d 165, 168–69 (D.P.R. 1999) (Casellas, J.) A plaintiff also must show that the similarly situated employees were "significantly younger than [he]." *Del Valle–Santana*, 804 F.3d

---

[16] Moran admits that Velez and Collis "determined that the Regional Engineering Director position occupied by Moran would be eliminated." (*See* Defendants' SUMF #89; Docket No. 40 at 24).

at 131 (citing *O'Connor*, 517 U.S. at 313 (requiring, for an inference of age discrimination, that the similarly situated employee be "substantially younger" than the plaintiff and disregarding whether the similarly situated employee was over or under forty years of age)).

As such, to satisfy his burden, Moran must demonstrate that when Baxter eliminated the position of Regional Engineering Director it was subsequently *filled* with someone *substantially younger* than him *with roughly similar qualifications*. *Velázquez– Fernández*, 476 F.3d at 11. Moran did not offer any evidence to carry his burden. Moran's sole argument to defeat summary judgment on this claim is that when he was terminated from employment at Baxter, he was scheduled to travel to Cali, Colombia to work on an assessment of a plant located there and that the rest of his team eventually traveled to the plant and performed the scheduled work, including the duties that he would have performed. In support thereof, Moran points to his own statement under penalty of perjury. (*See* proposed statement of uncontested fact #56; Docket No. 40-30). This proffer, even taken as true, does nothing to advance Moran's position because it fails to go to the heart of the matter—meeting his *prima facie* burden.

At a minimum, Moran had to identify the names of any other employee(s) similarly situated to him that was/(were) hired by Baxter to fulfill his prior duties as Regional Engineering Director.[17] He did not. Moran fails to offer a single name of an alleged person that Baxter hired to "replace" him for this position or an actual employee that absorbed all the tasks that Moran had previously performed. The fact is that Moran offers no evidence to show that Baxter sought a replacement for him with roughly the same job qualifications or that was similarly situated to him. Significantly, moreover, there is no evidence on this record to show that the position was filled by someone *substantially younger* than Moran. Moran offered no evidence, direct or circumstantial, suggesting that his prior position was filled by *anyone*, let alone someone younger than him that was similarly situated as him. That omission is fatal to his claim.

---

[17] Such evidence, if any existed, could have easily been obtained through proper discovery.

In sum, Moran neither alleges nor supports the fact that Baxter had a *continuing* need for the Regional Engineering Director position or that it hired someone substantially younger than him to fill the position after it was eliminated. As such, Moran cannot establish the fourth prong of the *prima facie* case with respect to the elimination of the Regional Engineering Director position. Because Moran fails to meet his initial burden of establishing a *prima facie* case of age discrimination on this claim, the Court does not need to reach Moran's arguments regarding the defendants' legitimate nondiscriminatory reason or whether his age was the "but-for" factor for eliminating the position. As a result, the Court **GRANTS** defendants' motion for summary judgment on this claim. Moran's ADEA claim with respect to the elimination of the Regional Engineering Director position is **DISMISSED with prejudice**.

    B.    Retaliation under the ADEA

The Court's journey through the record does not end here. In addition to claiming that the defendants discriminated against him by reason of his age, Moran also alleged that they retaliated against him because he exercised ADEA-related rights. The defendants argue that they are entitled to summary disposition on Moran's retaliation claim under the ADEA because he cannot establish his *prima facie* burden as he has no evidence that a causal connection existed between the protected conduct and the adverse employment actions alleged.

The Court begins with the basics. In addition to prohibiting age discrimination, the ADEA protects individuals who invoke the statute's protections. *See*, 29 U.S.C. § 623(d). Absent direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework remains the option of choice in retaliation cases, albeit with slight modifications. *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 827 (1st Cir. 1991). Under that framework, the plaintiff must first make a *prima facie* showing, namely, that: (i) he engaged in ADEA-protected conduct, (ii) he was thereafter subjected to an adverse employment action, and (iii) a causal connection existed between the protected conduct and the adverse action. *Id. See, Connell v. Bank of Boston,* 924 F.2d 1169, 1179 (1st Cir.), *cert. denied,* 501 U.S. 1218 (1991); *see, Torres-Alman v. Verizon Wireless Puerto Rico, Inc.*, 522 F. Supp. 2d 367, 394 (D.P.R. 2007) (generally, the basis for a *prima facie* retaliation case under the ADEA is that the plaintiff engaged in conduct protected by

the Constitution or by statute, that the defendant took an adverse action against the plaintiff, and that this adverse action was taken (at least in part) because of the protected conduct.) If the plaintiff makes his *prima facie* showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. *See, Mesnick,* 950 F.2d at 827. If the defendant presents such a reason, the ultimate burden falls on the plaintiff to show that the employer's proffered reason is a pretext masking retaliation for the employee's opposition to a practice protected by the ADEA. *Id.*

Defendants' cast their argument in terms of Moran's failure to make out a *prima facie* case. While the defendants do not offer a sequential discussion of each *prima facie* element that Moran needs to offer proof of, they do not appear to dispute that Moran comfortably meets the first component, and rightly so. The undisputed record shows that Moran engaged in ADEA-protected conduct because on October 7, 2016, Moran filed a charge of age discrimination with the EEOC. It is also undisputed that such filing was the first and *only* charge, grievance or complaint of discrimination that Moran ever filed against Baxter in any administrative or external forum. As for the second element, to support his retaliation claim, Moran maintains that Baxter took several allegedly adverse employment actions against him: (1) the elimination of the Regional Engineering Director position; (2) the "demotion" to the Jayuya position; and (3) his ultimate termination of employment. The defendants do not appear to dispute that these actions are indeed adverse.

The issue therefore lies with the third element of Moran's *prima facie* burden, which is causation. The defendants argue that they should be granted summary judgment on Moran's retaliation claim under the ADEA because there is no evidence of a causal connection between his protected activity—the EEOC charge—and the adverse actions alleged. In particular, the defendants observe that *all* the employment decisions which Moran complains of were made *before* he filed the EEOC charge. More specifically, that: (1) Baxter's decisions to eliminate the Regional Engineering Director position; (2) to transfer him to the Engineering Director position in Jayuya to Moran (which Moran refers to as a "demotion"); (3) and Baxter's decision to terminate Moran's employment, *all predated* October 7, 2016, the date of the EEOC charge.

To successfully make his *prima facie* showing, Moran must present sufficient evidence for a reasonable jury to find that, *after* he filed the EEOC charge, he was subjected to an adverse employment action, and a causal connection existed between his protected conduct and the adverse action that *followed*. *See, Mesnick,* 950 F.2d at 827. To establish the necessary causation and meet his burden, therefore, Moran must show that the adverse actions were *caused* by his EEOC filing. Absent special circumstances not present here, an adverse employment decision that *predates* a protected activity *cannot* be caused by that activity. *Muñoz v. Sociedad Española De Auxilio Mutuo y Beneficiencia De Puerto Rico*, 671 F.3d 49, 56 (1st Cir. 2012); *See e.g., Sabinson v. Trs. of Dartmouth Coll.,* 542 F.3d 1, 5 (1st Cir. 2008) (no causality when adverse employment decision was made two months *before* the plaintiff filed a complaint). This is also true— again, there are exceptions—when the adverse employment decision was contemplated but "not yet definitively determined" *before* the protected activity took place. *Muñoz, supra. See, Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 272, (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatsoever of causality.").

The defendants contend that it is impossible for Moran to meet his *prima facie* burden because he cannot establish that Baxter took any adverse actions against him *because* he filed a charge with the EEOC. They observe that the adverse actions alleged by Moran were all contemplated and decided *before* October 7, 2016—the date in which Moran filed the EEOC charge. According to the defendants, therefore, the EEOC charge could *not* have contributed to any of the adverse actions claimed by Moran because Baxter had *already made* the decisions to act adversely to Moran, and Moran was informed of such decisions, *before* he filed his charge of discrimination. Thus, the crux of the matter is causation. Did any of the adverse actions occur *after* Moran filed the EEOC charge?[18]

---

[18] That is not to say, however, that *if* Moran could show that either of the adverse actions was taken *after* he filed the EEOC charge, then, *automatically*, he would meet the causation element of the *prima facie* case. That would not be so because there are other factors to consider like "temporal proximity," for example. In this case though, if Moran cannot make a sufficient showing that the defendants took any of the adverse actions *after* he filed the EEOC charge, the analysis would necessarily stop there because Moran would have no way of proving that the adverse action was taken

Beginning with the elimination of the Regional Engineering Director position, Moran cannot support an inference of causation. The only argument that Moran offers is that he allegedly learned of the elimination of that position upon his termination, which occurred on October 31, 2016. He offers no evidence to support his argument and the undisputed evidence contradicts him. Here, the evidence indisputably shows that Moran *knew* of Baxter's decision to eliminate the Regional Engineering Director position *before* he filed the EEOC Charge. For example, in the unsworn statement proffered by Vélez, he attested that in September 2016 (one month *before* Moran filed the EEOC Charge), Moran was notified by the company that the Regional Engineering Director position would be eliminated. Moran does not offer evidence to contradict Vélez. And, in any case, there is additional proof corroborating the fact that Moran *knew* the position would be eliminated *prior* to his EEOC charge. Specifically, on August 26, 2016, Moran sent an email to Todd Collis, questioning him about the elimination of his "new" position and stating that it was "mindboggling" to him that Baxter "now" believes there is no need for his current position. Moran was clearly referring to the elimination of the Regional Engineering Director position, which is the position that he held at Baxter at that time. That email was sent more than one month *prior* to the EEOC charge. The EEOC charge is also illustrative. In it, plaintiff stated:

> ". . . *most recently I was informed* by Mr. Vélez and Mr. Todd Collis that *effective immediately* I will be assigned to a vacant Engineering management role at a substantial salary reduction in the Jayuya plant; the most remote location in PR. *I was also hinted that if I don't accept it, no budget will be available to fund my current services, hence, will be terminated.*"

(Docket No. 33-16.)

The EEOC charge, which plaintiff himself drafted, plainly suggests that *before* he filed it on October 7, 2016, Moran was entirely aware that his "current" position, Regional Engineering Director, would be eliminated by Baxter because allegedly there was no funding. To establish that an adverse employment action was caused by an employee's protected activity, the employer's decision to act adversely to the employee must *postdate*

---

(at least in part) *because* he filed the EEOC charge. An adverse action that *predates* a protected activity cannot be caused by that activity. *Muñoz, supra.*

the protected activity. *Muñoz*, 671 F.3d at 56. Here, Baxter's decision to eliminate the Regional Engineering Director position was clearly made *before* Moran filed the EEOC charge, and the evidence shows that Baxter had notified Moran, and he clearly knew of the decision, *before* he filed the complaint. Even if the position was "officially" eliminated on October 31, 2016, that was the carrying out of a plan avowed by Baxter long before the EEOC filing. Consequently, it was not caused by the protected conduct. So, the filing of Moran's EEOC charge cannot be the basis for the adverse employment action. Furthermore "it also cannot immunize an employee from action *already planned* and not dependent on the complaint." *Sabinson v. Trustees of Dartmouth Coll.,* 542 F.3d 1, 5 (1st Cir. 2008) (finding there was no causality when the adverse employment decision was made two months before the plaintiff filed a complaint); *Douglas v. J.C. Penney Co., Inc.*, 474 F.3d 10, 15 (1st Cir. 2007).

In sum, the elimination of the position had already been decided by Baxter and was inevitable regardless of the filing of the EEOC charge. Thus, Moran cannot show that the Regional Engineering Director position was eliminated (at least in part) *because* he filed a discrimination charge with the EEOC. The failure to show causation is fatal to Moran's retaliation claim.

Moran's remaining retaliation claims fare no better. Moving on to Moran's alleged demotion to the Engineering Director position in the Jayuya plant. It is uncontested that on September 28, 2016, Baxter sent a Memo to Moran offering him the Engineering Director position. So, Moran was officially offered that position on that date. This was a little over a month *before* Moran filed the EEOC charge. Furthermore, the EEOC charge drafted by Moran puts the final nail in this claim's coffin. In the charge, Moran stated that he had been informed by then "that *effective immediately* I will be *assigned to a vacant Engineering management role* at a substantial salary reduction *in the Jayuya plant*; the most remote location in PR.*" (Docket No. 33-16.) Even assuming that Moran's transfer to Engineering Director in Jayuya constituted a demotion, it is clear that the decision to "demote" Moran was the carrying out of a plan decided by Baxter *before* Moran filed the EEOC charge. And, Moran clearly had knowledge of Baxter's decision. As such, this challenged adverse action could not even arguably have been caused by the EEOC charge. This failure to show causation dooms Moran's retaliation claim.

The same holds true for Moran's retaliation claim related to his termination of employment with Baxter. Here, it is uncontested that Moran was given until October 6, 2016 to consider the offer for the Engineering Director position in Jayuya, which was one day *prior* to the EEOC charge. It is also uncontested that Moran did not timely respond to Baxter's offer for that position. As such, on October 7, 2016, Baxter sent a letter to Moran reiterating their prior offer and granting him five (5) additional days to consider it. In the letter, Baxter stated that if Moran did not answer by October 14, 2016, "we will understand that you have rejected our offer and as a logical consequence, your employment with Baxter will end on the same date." Even assuming that Moran had not read this letter *before* he filed the EEOC charge on October 7, 2016, because it was drafted on that same day, the EEOC charge is dispositive of the causation matter.

The key is that plaintiff detailed in the charge itself that he was "hinted [by Baxter] that *if [he] d[i]dn't accept [the Engineering Director position]*, *no budget will be available* to fund my current services, *hence, [I] will be terminated*." (Docket No. 33-16.) The evidence thus shows that *before* Moran filed the EEOC charge, he had *already* been informed by Baxter that should he not accept the Engineering Director position at the Jayuya plant, he would be terminated from employment with the company. Without a doubt, the evidence demonstrates that Baxter had *already* decided and had *already* notified Moran of the decision before he filed the charge. Moran's termination, although ultimately finalized *after* he filed the EEOC charge, was the carrying out of a plan decided and declared by Baxter *before* Moran filed the charge. That being so, the filing of the EEOC charge cannot possibly be the basis for Moran's termination.

With Moran's rejection of the Engineering Director position in Jayuya, his termination was inevitable irrespective of the EEOC charge. And, like his other claims, the failure to show causation is fatal to this claim. *Sabinson*, 542 F.3d at 5. *See e.g., Douglas v. J.C. Penney Co., Inc.,* 474 F.3d 10, 15 (1st Cir. 2007).

To wrap it up, based on the foregoing discussion, and the very chronology of the facts, the defendants are correct that Moran's EEOC charge cannot support an inference of causality for either of the allegedly adverse actions. In this case, the sequence of events and the undisputed record suggests the absence of a causal connection between the statutorily protected conduct, namely the EEOC charge, and the adverse employment

actions alleged, not the opposite. In sum, Moran did not provide evidence sufficient to permit a reasonable juror to find that he has established a *prima facie* case of retaliation under the ADEA because he was not able to show causation. *See, Del Valle-Santana*, 804 F.3d at 129-30. In addition to this lack of temporal coincidence, the Court could not find any competent evidence of retaliation. Moran's evidence is not sufficient to thwart summary disposition on his retaliation claims under the ADEA.

Because Moran has failed to limn a *prima facie* case of impermissible retaliation under the ADEA, defendants' motion for summary judgment on these claims is **GRANTED** and the claims are hereby **DISMISSED with prejudice**.

C.    Puerto Rico Law claims

In addition to the discrimination and retaliation claims under the ADEA, the plaintiff also asserted claims pursuant to Puerto Rico Law 100, Law 115, Law 80, and Articles 1802 and 1803 of the Puerto Rico Civil Code. The defendants moved for summary judgment on all state law claims, but the discussion and analysis in support of their request fell by the wayside. One sentence is all the defendants articulated to support their plea for the summary disposition of Moran's supplemental claims under Puerto Rico law. More specifically, in a statement thin as a rail, the defendants broadly suggest that Moran's local law claims should all be dismissed for the same grounds as those previously espoused to support their motion for summary judgment on Moran's ADEA claims. In addition to that one-liner, the defendants alternatively argue that the Court should decline to exercise supplemental jurisdiction over the state law claims because all federal claims should be dismissed by the Court.

As for the latter argument, such proffer goes up in smoke because at least one of Moran's federal claims survived summary judgment. This request is thus unavailing. As for their main argument, that summary disposition is proper on all of plaintiff's state law claims, the defendants alluded to this argument in passing but it was only cursorily raised and included no discussion whatsoever or developed argumentation to sufficiently warrant consideration. Courts do not generally entertain arguments skeletally raised nor should courts put the flesh into the threadbare bones of insufficient pleadings. It is a well-settled rule that insufficiently developed arguments are deemed waived. *See, Martínez-Rivera v. Commonwealth of Puerto Rico*, 812 F.3d 69, 78-79 (1st Cir. 2016).

*See, Marek v. Rhode Island*, 702 F.3d 650, 655 (1st Cir. 2012) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *Rivera–Muriente v. Agosto–Alicea*, 959 F.2d 349, 351 n.2 (1st Cir. 1992) (citing *Zannino*, 895 F.2d at 17, for the canonical rule that arguments not developed in any meaningful way are waived). *See, Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 997 n.8 (1st Cir. 1990) (relying on *Zannino,* 895 F.2d at 17 (for the point that "issues adverted to in passing, without any attempt at developed argumentation, are waived").

Defendants' request for summary judgment on plaintiff's Puerto Rico Law 100, Law 115, Law 80, and Articles 1802 and 1803 of the Puerto Rico Civil Code claims should be deemed as waived. But, notwithstanding the defendants' decision to punt the issue of the vitality of Moran's claims under Puerto Rico law, judicial economy and the interests of justice call upon the Court to resolve the matter independently and with no assistance from the moving party.

### 1.   *Law 100*

Law 100 is Puerto Rico's general employment anti-discrimination statute. P.R. Laws Ann. tit. 29, § 146.  It creates civil liability for "[a]ny employer who discharges, lays off or discriminates against an employee . . . because of his/her age . . . ." *See id.*; *Cardona-Jiménez v. Bancomerico de P.R.*, 174 F.3d 36, 42 (1st Cir. 1999). Law 100 is the Puerto Rico equivalent of the federal ADEA, providing for civil liability in age discrimination actions. *Cardona-Jiménez,* supra. The First Circuit has found that "on the merits, age discrimination claims asserted under the ADEA and under Law 100 are coterminous." *Dávila v. Corporación De P.R. Para La Difusión Pública*, 498 F.3d 9, 18 (1st Cir. 2007). In the context of age discrimination, Law 100 is "similar in several respects [to the ADEA], [but] the two statutes diverge on how discrimination is to be proved." *Cardona-Jiménez*, supra. *See Pérez-Maspons,* 208 F. Supp. 3d at 423.

Beginning with Moran's age discrimination claim as it relates to his removal as Plant Manager and transfer to the Regional Engineering Director position, in the ADEA analysis above, the Court previously explained that Moran's aggregate package of proof is sufficient to withstand summary judgment on this claim. The Court found that genuine issues of material fact exist as to the ultimate question: whether the true reason behind Moran's transfer was age discrimination. The Court therefore denied the defendants'

request to summarily dismiss this ADEA claim. Since the ADEA and Law 100 are coterminous, and the pretext analysis is practically the same under both federal and local law, the Court borrows from its analysis under the ADEA to similarly find that Moran's Law 100 claim concerning his transfer to Regional Engineering Director also withstands summary judgment.

Moving on, Moran also asserted a claim under the ADEA and Law 100 alleging that he was the object of age discrimination when the defendants eliminated the Regional Engineering Director position, shortly after the position had allegedly been created for him. Different from Moran's discrimination claim premised on his transfer to Regional Engineering Director, the Court has previously found that Moran was unable to satisfy his ADEA *prima facie* burden with respect to the elimination of such position. That being the case, Moran's ADEA claim based on the elimination of the Regional Engineering Director position cannot withstand summary judgment. Because of the defendants' lackadaisical form of argumentation, the same, however, cannot be said for Moran's analogous Law 100 claim.

While the Court acknowledges that the analytical principles under the ADEA and Puerto Rico Law 100 are substantially the same, the *prima facie* elements are not identical. Under Law 100, plaintiff bears the initial burden of establishing: (1) that he suffered an adverse employment action; (2) that the adverse employment action was not justified; and (3) some basic fact substantiating the type of discrimination alleged. *See Hoyos v. Telecorp. Commc'ns, Inc.,* 405 F. Supp. 2d 199, 206–07 (D.P.R. 2005)*, aff'd,* 488 F.3d 1 (1st Cir. 2007). In other words, under Law 100, the plaintiff basically has two requirements to establish a *prima facie* case: (1) he must demonstrate that he suffered an adverse action; and (2) he must allege that the decision was discriminatory. *Cardona Jimenez*, supra; *see Alvarez–Fonseca,* 152 F.3d at 28. The plaintiff's showing under Law 100 is "minimal." In contrast, under the ADEA, to establish a *prima facie* case, the plaintiff must prove that he was at least 40 years old at the time, that he was otherwise qualified for the position, that he nevertheless suffered an adverse employment action, and that the employer subsequently filled the position with someone younger with roughly similar qualifications, thus revealing the employer had a continuing need for the same services the plaintiff had been performing. *See, Texas Dept. of Community Affairs*

*v. Burdine,* 450 U.S. 248, 252–253 (1981); *Del Valle-Santana v. Servicios Legales De Puerto Rico, Inc.,* 804 F.3d 127, 129–30 (1st Cir. 2015).

In their brief, the defendants chose not to utter a single word to justify the summary disposition of Moran's Law 100 claims. Because the elements necessary to establish a *prima facie* case under Law 100 are not identical to those under the ADEA, the Court cannot simply borrow from its prior analysis under the ADEA to assess the merits of Moran's comparable Law 100 claim. Instead of trying to hazard our own guess as to what defendants' argument may or may not portend, the Court must default to the settled rule that insufficiently developed arguments are deemed waived. *See Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 997 n.8 (1st Cir. 1990) (relying on *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990) (for the point that "issues adverted to in passing, without any attempt at developed argumentation, are waived"). Accordingly, Moran's Law 100 claim grounded on the *elimination* of the Regional Engineering Director position lives to see another day.

To sum up, Moran's two age discrimination claims under Law 100 outlive summary disposition. Accordingly, the defendants' motion for summary judgment on Moran's Law 100 claims is **DENIED without prejudice**.

### 2.     *Law 115*

Law 115 is Puerto Rico's anti-retaliation statute. To allege retaliation under Law 115, plaintiff must have been retaliated against by his employer. P.R. Laws Ann. tit. 29, § 194(a). The statute imposes an obligation on the employee to establish, through direct or circumstantial evidence, a *prima facie* case proving that he or she (a) participated in an activity protected by §§194 et seq., and that (b) he or she was *subsequently* dismissed or suffered an adverse employment action. *Id. Feliciano Martes v. Sheraton Old San Juan*, 182 D.P.R. 368, 2011 PR Sup. LEXIS 89 (D.P.R. 2011); *Lupu v. Wyndham El Conquistador Resort & Golden Door Spa*, 524 F.3d 312, 313 (1st Cir. 2008).

"This court has previously held that ADEA and Law 115 retaliation claims are similar and have parallel evidentiary mechanisms." *Perez-Maspons*, 208 F. Supp. 3d at 23; *Baerga–Castro v. Wyeth Pharm.*, No. 08–1014 (GAG), 2009 WL 2871148, at *13 (D.P.R. Sept. 3, 2009) (citing *Sanchez Borgos v. Venegas Const. Corp.*, No. 07–1592 (SEC),

2009 WL 928717, at *6–7 (D.P.R. Mar. 31, 2009)). "Law 115 – is largely 'symmetrical in scope,' and has 'parallel evidentiary mechanisms,' to the anti-retaliation provisions in . . . ADEA." *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 97 (1st Cir. 2018) (internal citations omitted). *See, Vélez*, 467 F.3d at 809 (suggesting there is no distinction between the *prima facie* showing of a federal ADEA and Law 115 retaliation claim); *see also Wirshing v. Banco Santander de P.R.,* 254 F. Supp. 3d 271, 277 (D.P.R. 2015) (explaining that "the federal courts . . . have consistently treated a claim under Law 115 the same as a claim pursuant to Title VII's [or the ADEA's] antiretaliation provision").

Indeed, the defendants did not sufficiently argue for the summary disposition of Moran's retaliation claim under Puerto Rico Law 115. But they argued extensively for the dismissal of Moran's retaliation claim under the ADEA. Notwithstanding the defendants' failure to discuss the merits of Moran's Law 115 claim, courts have consistently found that the *prima facie* elements under both the ADEA and Law 115 are essentially the same, and federal courts have routinely treated claims under both statutes in the same manner. In line with those principles, the Court incorporates its earlier analysis of plaintiff's ADEA retaliation claim to his analogous state law retaliation claim. To recap, the Court previously found that the very chronology of the facts of this case cannot support an inference of causation between Moran's protected activity (his EEOC charge) and the adverse actions alleged. The fact is that Moran did *not* participate in any protected conduct *before* the challenged adverse actions. As such, the lack of causation is fatal to Moran's claims because he cannot establish a *prima facie* case of retaliation.

Identical to Moran's retaliation claims under the ADEA, his allegations cannot sustain a claim for retaliation under Law 115. *See, González v. Schneider Elec. Bldgs. Americas, Inc.*, No. 10–1876 (GAG), 2011 WL 1311742, at *5 (D.P.R. Apr. 4, 2011) (granting defendant's motion to dismiss plaintiff's Law 115 claim for lack of protected conduct *pre-dating* any adverse employment action). The Court therefore **GRANTS** the defendants' motion for summary judgment on plaintiff's retaliation claim under Law 115. Such claim is **DISMISSED with prejudice.**

> ### 3.      *Law 80*

Moran also brought a claim under Puerto Rico Law 80, which "requires employers to compensate at-will employees who are discharged without just cause." *Ruiz–Sanchez v. Goodyear Tire & Rubber Co.*, 717 F.3d 249, 254 (1st Cir. 2013). Unlike the previously discussed local law claims, Law 80 does not have a federal equivalent so the Court cannot say that any of its prior discussion informs the vitality of this specific claim. Furthermore, the defendants provide no discussion whatsoever concerning the merits of Moran's Law 80 claim. As such, the Court must deem the defendants' request for summary judgment on plaintiff's Law 80 claim as waived and need not address it further. *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d at 98. *See, Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988) (explaining that "a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace" (citation omitted) (quoting *Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir. 1988)).

With no assistance from the moving party, the Court simply cannot make a dispositive ruling and therefore the *status quo* remains. The Court **DENIES without prejudice** the defendants' motion for summary judgment on Moran's Law 80 claim.

> ### 4.      *Articles 1802 and 1803*

Finally, plaintiff alleges entitlement to recovery of damages under Articles 1802 and 1803 of Puerto Rico's Civil Code. The statute provides that a person who "causes damages to another through fault or negligence" shall be liable in damages. P.R. Laws Ann. tit. 31, § 5141. Article 1803 applies the principle of *respondeat superior* to Article 1802 claims. P.R. Laws Ann. tit. 31 § 5142; *Pagán–Cólon v. Walgreens of San Patricio, Inc.,* 697 F.3d 1, 16 (1st Cir. 2012).

Here, the defendants did not offer a single argument to justify the summary disposition of Moran's claims under Articles 1802 and 1803. Though the Court wishes not to reward the defendants' omission, and the argument should be deemed as waived, the fact of the matter is that plaintiff's tort claim can be easily disposed of. It has been firmly established that a plaintiff may bring an additional claim for tortious or negligent conduct under Articles 1802 and 1803 *only* if the conduct is distinct from the conduct covered by the specific labor or employment law for which a plaintiff seeks damages. *Reyes–Ortiz v. McConnell Valdes*, 714 F. Supp. 2d 234, 239 (D.P.R. 2010) (citations

omitted); *Santini Rivera v. Serv. Air, Inc.,* 137 D.P.R. 1 (D.P.R. 1994); *Pérez-Maspons, Inc.,* 208 F. Supp. 3d at 424; *Santana-Colon v. Houghton Mifflin Harcout Pub. Co.*, 81 F. Supp. 3d 129, 140 (D.P.R. 2014).

In this case, Moran has not set forth independent grounds for a tort claim to survive summary disposition. Moran is thus barred from bringing a tort claim under Articles 1802 and 1803 because the unlawful tortious conduct that he complains of is based on the same facts that give rise to his causes of action under federal and Puerto Rico's discrimination and retaliation statutes. *Reyes–Ortiz*, 714 F. Supp. 2d at 239; *see also Blasco Figueroa v. Puerto Rico Aqueducts and Sewer Authority*, No. 14–1395 (GAG), 2016 WL 1122003, at *8 (D.P.R. Mar. 22, 2016). In short, the plaintiff alleges no independent tortious conduct by the defendants that would make his tort claim plausible.

Accordingly, the plaintiff's claims under Articles 1802 and 1803 of the Puerto Rico Civil Code cannot escape the hot fire of dismissal. The Court **DISMISSES** such claims **with prejudice**.

## V.   Conclusion

Based on the foregoing discussion, the Court **GRANTS in part** and **DENIES in part** the defendants' motion for summary judgment at Docket No. 33. To summarize, the following claims survived summary disposition: (1) Moran's age discrimination claim under the ADEA, only with respect to his *transfer* to the Regional Engineering Director position; (2) Moran's Puerto Rico Law 100 age discrimination claims grounded on his *transfer* to the Regional Engineering Director position and the subsequent *elimination* of such position; and (3) Moran's wrongful discharge claim under Puerto Rico Law 80. All other claims asserted by the plaintiff in the present action are hereby **DISMISSED with prejudice.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 27th day of September 2021.


MARSHAL D. MORGAN
United States Magistrate Judge